CALVIN J. COWLES v. THE STATE OF NORTH CAROLINA.

*Action Against the State—Petition for Recommendatory Judgment—Right of State to Plead Statute of Limitations.*

1. In proceedings under sections 947 and 948 of *The Code* for the adjudication of alleged claims against the State, the State has the right to plead the bar of the statute of limitations to prevent a recommendatory decision.

2. When the facts pertaining to an alleged claim against the State are well known, or readily ascertainable, and there are no " grave questions of law " to be decided, in order that the General Assembly may be informed as to its duty under the law, this Court will not · undertake to render a recommendatory judgment thereon, nor was it intended by the provision of the Constitution (Art. IV, § 9) that it should do so.

3. The fact that the General Assembly of North Carolina, in funding its recognized debt by the Act of 1879 and the amendatory acts, made no provision for a certain class of bonds, is tantamount to a declaration by it that such bonds did not constitute a valid obligation of the State.

PETITION by Calvin J. Cowles, under sections 947 and 948 of *The Code,* for the recommendatory judgment of the Court.

The petition was filed March 31, 1894, and is as follows:

"1. That by an act entitled 'An act to incorporate the Chatham Railroad Company,' ratified the 14th day of February, 1855, a charter for the incorporation of a railroad from Raleigh, or some point on the North Carolina Railroad west of Raleigh, to the coal fields of Chatham County, was granted. But the said charter expired because sufficient funds were not raised to put it in operation.

"2. That a second charter was granted on the 15th day of February, 1861, by an act entitled 'An act to incorporate the Chatham Railroad Company'; and by an act entitled 'An act supplemental to an act passed at the present session of the General Assembly, entitled An act to incorporate the Chatham Railroad Company,' ratified the 23d day of February, 1861, the Public Treasurer was authorized to issue $200,000 of bonds for the benefit of the Chatham Railroad Company, under certain conditions. That efforts were made to raise stock sufficient to organize the company and to comply with the conditions required by the supplemental act, but without success.

"3. That thereupon application was made to the Convention of State for a change of those conditions and increased aid by the State; that this application was granted by an ordinance entitled 'An ordinance in addition to and amendment of an act of the General Assembly, ratified the 15th day of February, 1861, entitled An act to incorporate the Chatham Railroad Company,' and to repeal an act supplemental thereto, ratified the 23d day of February, 1861,' which ordinance was ratified the 30th day of January, 1862; that by this ordinance the supplemental act of 1861 was repealed, and it was provided that solvent corporations subscribing to the stock of the Chatham Railroad Company could pay their subscriptions with six per cent. twenty-year

State bonds, which the State agreed to furnish said corporation in exchange for their bonds of like amount, the total State bonds not to exceed $800,000.

"$3\frac{1}{2}$. That the Chatham Railroad Company, on __, executed and delivered to Z. B. Vance, Governor of North Carolina, a deed of mortgage, under the seal of said company, wherein and whereby was conveyed to said Governor and his successors in office, for the use and benefit of the State, all the estate, both real and personal, belonging to said company, or in any manner pertaining to the same, conditioned for indemnifying and saving harmless the State of North Carolina from the payment of the whole or any part of the bonds of the State authorized to be made by the Public Treasurer, and to be delivered to the several corporations subscribing as aforesaid to the capital stock of the said Chatham Railroad Company, a copy of the said mortgage being hereto annexed and made a part hereof, and marked 'Exhibit A.'

" 4. That under these provisions the Raleigh and Gaston Railroad Company, a solvent corporation, subscribed to $200,000 stock in the Chatham Railroad Company, executed its bonds for that amount to the State, and received in exchange $200,000 State bonds, which were immediately paid over to the Chatham Railroad Company, and by that company were sold in the market to the highest bidder, except $14,000 undisposed of. The city of Raleigh, in pursuance of a vote of its inhabitants, subscribed for $50,000 stock, and paid $1,000 in cash, depositing its bonds for $49,000 in the treasury of the State, and received therefor $49,000 of State bonds, and paid them to the Chatham Railroad Company for said stock. Of these the latter company sold only $15,000.

" 5. That there are now outstanding of said bonds $215,000.

" 6. That none of these bonds were issued 'in aid of the rebellion.' That the work intended to be accomplished by their issue was the opening up of the Deep river region, long a cherished object of the State. That immense appropriations

had been made by the State to secure slack-water navigation on Cape Fear and Deep rivers, and large sums had been granted in aid of the railroad connecting Fayetteville with the coal fields. That a charter for the incorporation of the Chatham Railroad Company was granted as long ago as 1854, renewed and $200,000 granted before the war. That the ordinance authorizing the bonds in question is an amendment to the charter granted before the war. That the appropriation was not made at the instance of the late Confederate Government, or any department or officer thereof; in fact, no aid was lent to the enterprise by said government, or any of its officers, until January, 1864, many months after the passage of the ordinance.

"That the appropriation was not asked for by the Governor of the State, or any military or other officer, nor is it possible to infer that the subscribers to the stock—mainly the Raleigh and Gaston Railroad Company, the city of Raleigh, and a few citizens of Wake and Chatham Counties—had any other purpose in view than to subserve their private interests.

"That the Convention, at the same session, chartered the Fayetteville and Florence Railroad Company, the Washington and Tarboro Railroad Company, and made important amendments to the charter of the Cheraw and Coal Field Railroad Company and the Western Railroad Company, all of which enterprises evidently were not designed to aid the rebellion,

"That nothing in the words of the charter, or the amendments to the same, or in the character of the vote given for the appropriation or against it, or the enterprise itself, or the promoters, shows that these bonds were issued with the object of aiding the war.

"That the State bonds referred to are dated and were issued as aforesaid in January 1, 1863, at which time gold was selling at three for one, this being the scale of deprecia-

tion of Confederate money fixed for that date by the State of North Carolina. (See *The Code*, § 2495.)

"That the plaintiff Calvin J. Cowles is the owner and *bona fide* holder, for value, of $10,000 of said bonds of the denomination of $1,000 each, dated and issued on January 1, 1863, with all the coupons from January 1, 1867, to January 1, 1883, inclusive, attached thereto ; five of these bonds, being numbered 11, 12, 13, 14 and 15, were issued to the city of Raleigh and endorsed by it, and five of them were numbered 18, 19, 20, 21 and 22 and were issued to the Raleigh and Gaston Railroad Company and endorsed by it.

"Wherefore, the plaintiff demands judgment:

"1. That said bonds be declared valid and binding against the said State.

"2. That the plaintiff Calvin J. Cowles do 'recover against the said State the sum of $10,000, with interest thereon from July 1, 1867, subject to the legislative scale.

"3. That this Court shall recommend to the General Assembly of North Carolina that provision be made for the settlement of the said judgment at the rate of forty cents on the dollar.

"4. For other and further relief."

The answer of the State was as follows:

"The defendant, answering the complaint in the above-entitled cause, but reserving the right to remove or dismiss the action, says:

"1. That the allegations contained in the first, second and third paragraphs of the complaint are true.

"2. That as to the allegations contained in the fourth paragraph thereof, this defendant has no knowledge or information sufficient to enable it to form a belief as to the truth, and therefore denies the same.

"3. That as to the allegations contained in the fifth paragraph thereof, this defendant has no knowledge or informa-

tion sufficient to enable it to form a belief as to the truth, and therefore denies the same.

"4. That as to the allegations contained in the sixth paragraph thereof, 'that none of the bonds upon which this complaint is filed were issued in aid of rebellion,' is not true. That the defendant has no knowledge or information sufficient to enable it to form a belief as to the truth of the other allegations of this paragraph, and denies the same, except so much as states 'that a charter for the incorporation of the Chatham Railroad Company was granted as long ago as 1854, renewed, and $200,000 granted before the war; that the ordinance authorizing the bonds in question is an amendment to the charter granted before the war,' and the defendant admits the truth of this statement.

"5. The defendant admits the truth of the allegations contained in the seventh paragraph.

"6. That the allegations contained in paragraph 8, 'that Calvin J. Cowles is the owner and *bona fide* holder, for value, of the bonds described in the complaint,' is not true."

The defendant, further answering the complaint, says:

"1. That more than ten years have elapsed since the plaintiff's cause of action accrued, as is apparent on the face of the complaint.

"2. That more than three years have elapsed since the plaintiff's cause of action accrued, as is apparent on the face of the complaint.

"3. That as appears on face of said bonds, they are payable in Confederate money alone, and this, as defendant is advised and believes, was in aid of rebellion.

"4. That by an act of the Legislature, ratified the 4th day of March, 1879, provision was made to compromise, commute and settle the State debt then existing, of which said State debt the said bonds purport to be a part; and that there is in the said Act of the Legislature no recognition of said bonds as a part of the State debt, and no provision for the payment or settlement thereof.

" Wherefore, the defendant prays that it may be dismissed with its costs."

Mr. *John W. Hinsdale,* for petitioner.
Mr. *F. H. Busbee* and the *Attorney-General,* for the State.

BURWELL, J.: The State, through its proper officer, interposes the plea of the statute of limitations against the prayer of the petitioner for the recommendatory decision of this Court on the claim which, in his petition, he sets up as the basis of this action, and it appears on the face of this petition that more than ten years have elapsed since his alleged cause of action accrued.

It was intended by the provision of the Constitution—Article IV, section 9, and the statute, *Code,* sections 947 and 948—that persons who asserted that they held legal claims against the sovereign State should here find a tribunal before which they might have, in proper cases, the legality of their claims adjudicated—a tribunal before which the sovereign State would, for a certain purpose, abdicate the privilege of exemption from liability to be sued and appear as any other litigant, to the end that its liability to the petitioner might be determined by the law.

We see no good reason why, in such proceedings as this, we should not be required to determine the rights of the petitioner and the liability of the State by the same laws that would govern those rights and that liability if the action were against an individual debtor. While it may be true that the statute of limitations would not be allowed to bar the prosecution by the State of its claims against the citizen, except for the provisions of *The Code,* § 159, it does not follow from this that the State may not herself plead that statute and interpose its bar to prevent our recommendatory decision against her. It is not for us here to say whether or not

there is a moral obligation resting upon the commonwealth to pay the petitioner a certain sum of money, but whether, under the law that controls such a controversy when waged between two citizens, the State is indebted to this petitioning citizen. " Considerations of honor or magnanimity can have no bearing in determining what the law is. ' The State has referred its rights to judicial tribunals to be decided by the law. If by it the claim is barred, they must so declare, though it might be just and honorable for the State to pay it if it has never been paid, notwithstanding the bar." *Baxter* v. *Wisconsin*, 10 Wis., 454.

This tribunal to which the petitioner now comes to have his alleged rights against the State adjudicated, was open to him for that purpose when his rights accrued more than ten years ago. The remedy—such as it is—given him by the Constitution and the law for alleged wrong done him by the State was then exactly what it is now. He has seen fit to delay to prosecute his supposed right in the only tribunal open to him for its adjudication. Because of the length of that delay the law has barred his claim, and we cannot declare that the State is legally indebted to him.

Moreover, we do not think that the claim against the State set out in the petition is one that calls for the exercise by us of our recommendatory decision. If, in any sense, it may be called a claim against the commonwealth, it is a part of that mass of bonded indebtedness which was outstanding when the Constitution of 1868 was adopted. It is well known that the legislative department of the government to which our recommendation will be made, if made at all, has done what it has thought best to do in the settlement of those liabilities. The act of 1879, and the several acts amendatory thereof, express the will of the Legislature in regard thereto. The refusal or failure of the General Assembly in each of these acts to recognize and provide for the class of claims to which those of the petitioner belong, is tan-

tamount to a declaration by that department that they constitute no valid obligation of the State. The facts which are set out in the petition are such that, if true, they are well known to the proper officers. A legislative committee can as easily inquire into them as can a court. Not only are the facts pertaining to the matter well known or readily ascertainable, but it does not seem to us that there are here any "grave questions of law" that must be decided by us in order that the legislative department of the government may be informed as to its duty under the law. It was intended, as it seems to us, by this provision of the Constitution that the opinion of this Court upon important questions of law in certain cases might be had in order that the General Assembly might be thereby aided in the discharge of its duties under the law (*Reynolds* v. *State*, 64 N. C., 460), and not that this tribunal should be the censor of the legislative department in such matters, and authorised and required to sit in judgment upon the acts of a co-ordinate department of the government in a matter about which it is necessarily as well advised as we can be.

The petition must be dismissed.